## CIRCUIT COURT OF FAIRFAX COUNTY

Deborah MacDougall

 v.

Richard S. Levick

October 10, 2013

Case No. CL-2011-0004071

BY JUDGE RANDY I. BELLOWS

Before the Court is the Defendant's Petition for Declaration of Marriage Status and Related Relief. On September 30 and October 1, 2013, the parties presented their evidence and the Court took the matter under advisement. After considering the evidence and briefs of both parties and for the reasons discussed below, the Court grants the Defendant's motion and finds that the parties' marriage is void *ab initio*.

### *Introduction*

This is a case about a marriage ceremony without a marriage license, followed by a marriage license without a marriage ceremony. Neither the former, nor the latter, nor some combination of the both, created a legal marriage. The marriage is void, not merely voidable. The Court reaches this result because it believes the statutes in question are absolutely clear, unequivocal, and mandatory as to the core requirements for the creation of a legal marriage in the Commonwealth of Virginia, and those requirements were not met in the instant case.

A marriage ceremony without a marriage license has no legal effect. Similarly, a marriage license without a marriage ceremony has no legal effect. That the parties intended to be married, believed they were married, and held themselves out to be married for years does not permit the Court to reach a different result. A void marriage does not become legal or merely voidable because the parties intended to be married, thought they were

married, or engaged in divorce litigation. Nor can a void marriage be deemed legal by resort to the curative statute that permits a court to recognize the validity of a marriage despite "defect, omission, or imperfection," for that statute only applies to a "marriage solemnized under a license." Va. Code § 20-31. Here, there was no license. Finally, because this Court finds the marriage to be void, not voidable, the Court does not reach the issue of laches or estoppel, legal principles that would only be applicable, if at all, if the Court found the marriage to be voidable. For the reasons stated below, the Defendant's motion to declare the marriage void is granted.

## I. *Procedural History*

On March 21, 2011, the Plaintiff, Deborah MacDougall, filed a complaint for divorce from the Defendant, Richard Levick. In the following two years, the Plaintiff and Defendant engaged in extensive litigation, including numerous discovery disputes, *pendente lite* matters, a plea in bar, motions for declaratory judgment, sanctions motions, the filing of amended complaints and counterclaims, and other matters. Multiple hearings, including several evidentiary hearings, have been conducted to resolve pending disputes. Much of the litigation has concerned a July 2009 written agreement entered into by the parties, in particular, whether it was a marital agreement or a separation agreement, whether it was abrogated by reconciliation, and whether the Defendant had waived his right to challenge the validity of the agreement.

On August 27, 2012, the Court signed an Order finding that the Defendant had waived his right to contest the validity of the marital agreement. The Plaintiff sought sanctions with regard to the Defendant's continuing efforts to invalidate the marital agreement, which the Court denied on November 30, 2012. Resolution of the protracted litigation regarding the marital agreement set the stage for the Court to resolve in a subsequent hearing all remaining matters of equitable distribution, spousal support, and the grounds for divorce. However, in late February 2013, that situation changed.

On February 27, 2013, the Defendant filed a Petition for Declaration of Marriage Status and Related Relief, alleging that the parties' marriage was void *ab initio*. In his Petition, the Defendant asserted that the parties' marriage was null and void because the marriage license was obtained after the marriage ceremony and was subsequently signed by the officiant without either party being present. In light of the allegedly void nature of the marriage, the Defendant requested that the Court vacate all of its prior orders and decrees, find the July 20, 2009, Marital Agreement invalid and unenforceable, order recoupment and restitution from the Plaintiff to the Defendant for monies and benefits received, and partition jointly titled real and personal property.

On March 15, 2013, after obtaining leave of court to file amended pleadings, the Defendant filed an Amended Counterclaim alleging

the nullity of the parties' marriage and requesting related relief. On April 5, 2013, the Plaintiff filed an Answer to Defendant's Amended Counterclaim, asserting affirmative defenses of res judicata and collateral estoppel to the issue of the validity of the July 20, 2009, agreement and laches and estoppel as to the Defendant's contest of the validity of the parties' marriage.

The Defendant's Petition for Declaration of Marriage Status and Related Relief proceeded to trial on September 30, 2013, on the issue of the validity of the parties' marriage. The motion was heard in a bench trial before this Court on September 30 and October 1, 2013. In this Letter Opinion, the Court resolves the issue of the validity of the parties' marriage as presented by the Defendant's Petition for Declaration of Marriage Status and Related Relief, the extensive briefing of the issues by the parties, and the evidence presented during the trial.

## II. *Facts Pertinent to the Pending Motion*

On December 21, 2002, the parties gathered together, with their family and friends, at their home in McLean, Virginia, to participate in a marriage ceremony. Stipulation ("Stip."), Def. Ex. 42, p. 2, ¶ 1. Prior to the ceremony, during a discussion with the officiant, Rabbi Binyamin Biber, the parties realized that they had not obtained a Virginia marriage license prior to the ceremony. Def. Br., p. 5; Pl. Br., p. 2. Despite the lack of a marriage license and despite the fact that the Rabbi had never performed a wedding before where the marriage license was not already present, the parties and Rabbi Biber decided to go forward with the ceremony on December 21, 2002. Deposition of Binyamin Biber ("Biber Dep."), 12:6-9, June 20, 2013; Def. Br., p. 5; Pl. Br., p. 2. At the time, Rabbi Biber informed the parties that whenever they obtained a marriage license, they could send it to him and he would sign it. Biber Dep., 15:11-15.

Approximately two weeks later, on January 6, 2003, the parties went to the Clerk of the Circuit Court of Fairfax County, Virginia, filed a sworn Application for Marriage License, and were issued a marriage license permitting lawful matrimony in the Commonwealth of Virginia. Stip., Def. Ex. 42, p. 3, ¶ 4; Marriage Register ("License"), Def. Ex. 4. Significantly, the license indicated that the "marital status" of Plaintiff was "widowed," which is consistent with the recognition that the December 21, 2002, ceremony had not created a new marriage. Evidence at trial demonstrated that, after receiving the license on January 6, the parties agreed that the Defendant would send the license to Rabbi Biber. Further evidence showed that the Defendant, or one of his employees, sent the marriage license by Federal Express mail to Rabbi Biber.

Rabbi Biber testified that he received the license on January 21, 2003, when he returned from vacation and found the license in a stack of mail. Biber Dep., 15:18-22. Upon receipt of the license, Rabbi Biber signed

the license and listed the date of marriage as January 21, 2003. Biber Dep., 17:4-7, 20:5-9. Rabbi Biber testified that he put January 21, 2003, as the marriage date because he "wasn't sure if it was proper to backdate it . . . [he was] not sure if that was the correct legal thing to do, but that's what [he] did because [he] wasn't sure if [he] should do anything else." Biber Dep., 20:3-4, 7-9.

When asked whether he performed a ceremony or officiated the exchanging of vows between the parties on January 21, 2003, Rabbi Biber stated that he did not do another ceremony other than that performed on December 21, 2002. Biber Dep., 20:19-22; 21:1-2. In explanation, he testified that:

> I did the ceremony on December 21st, 2002, and — I mean, maybe mistakenly, but I conceived that when I received the marriage license, that was completing the whole thing that we had done on December 21st. And so I just simply, you know, filled out the rest of it that I would have filled out in McLean, Virginia. And, again, maybe I should have put the date of the ceremony. I don't know what would have been the proper legal thing to do, but I signed it as I would have had we filled it out the day of the wedding. . . . I assumed when I received the marriage license that that was their — the intention was to complete the ceremony which normally does include the signing of a marriage license when that's possible.

Biber Dep., 21:1-11; 25:5-9.

Evidence at trial confirmed that neither party was present on January 21, 2003, when Rabbi Biber signed the marriage license; in fact, the Defendant was in California on business at the time. Stip., Pl. Ex. 37, ¶ 3.

On February 11, 2003, after being signed by Rabbi Biber, the Clerk of the Circuit Court of Fairfax County received the parties' marriage license. License, Def. ex. 4 (date stamped February 11, 2003). The Clerk made return of the marriage license to the State Registrar, where it was filed and maintained within the Division of Vital Records. Stip., Def. Ex. 42, p. 4, ¶ 7. The parties consummated the marriage and cohabited together in Fairfax County, Virginia, from December 21, 2002, to August 1, 2010. Stip., Def. Ex. 42, p. 4, ¶ 9.

At trial, both parties testified that they believed themselves to be legally married after the ceremony on December 21, 2002, and the signing of the marriage license by Rabbi Biber. Plaintiff testified that she still believes the parties to be legally married in Virginia. Defendant testified that he believed the parties to be legally married in Virginia until he met with defense counsel on February 19, 2013, during which Defendant and his counsel discussed the discrepancy between the ceremony date of December 21, 2002, and

the date of marriage on the marriage license, January 21, 2003. Defendant stated that he immediately investigated the status of his marriage by visiting the Clerk's Office for the Circuit Court of Fairfax County and speaking with Rabbi Biber. The Defendant then authorized his counsel to notify the Court and opposing counsel as to the matter. On February 27, 2013, the Defendant, by counsel, filed a Petition for Declaration of Marriage Status and Related Relief, the motion upon which this Letter Opinion is based.

### III. *Pertinent Statutes*

Among other domestic relations subjects, Title 20 of the Virginia Code encompasses numerous statutes that provide the requirements for a valid marriage, the requisite elements to obtain a valid marriage certificate, the persons authorized to perform marriages, the various penalties for failing to abide by the requirements for a valid marriage, and the various ways in which a marriage may be void or voidable. The marriage statute, Va. Code § 20-13, presents the starting point for any analysis as to the validity of a marriage. This Court's interpretation of § 20-13 is informed by various other statutes in Title 20, in addition to well-recognized definitions of terms that appear in the statutes.

#### A. *Virginia Code § 20-13*

Va. Code § 20-13 provides the requirements for a valid marriage in the Commonwealth:

Every marriage in this Commonwealth shall be *under a license* and solemnized in the manner herein provided.

Va. Code Ann. § 20-13 (emphasis added). The requirements of § 20-13 are mandatory and prohibitive, not merely directory, and any marriage that does not comply with the statutory requirements is considered void. *See Offield v. Davis*, 100 Va. 250, 261-63, 40 S.E. 910 (1902) (finding that no marriage may be held valid if it is not under a license and solemnized according to Virginia statutes).

Both parties in this case focused considerable attention on the question of whether § 20-13 mandates a particular order in which the two statutory requirements, licensure and solemnization, must take place. While neither the statute nor Title 20 of the Virginia Code define the words "under" or "license," the Court can look to generally recognized definitions of these words to assist in interpreting the statute. The *New Shorter Oxford English Dictionary* defines "under" as "subject to the authority, control, direction, or guidance of." *The New Short Oxford English Dictionary* 3469 (Oxford Univ. Pr. 1993). *Black's Law Dictionary* defines the word "license" as "[a] permission, usu. revocable, to commit some act that would otherwise be unlawful" and/or "the certificate or document evidencing such permission."

*Black's Law Dictionary* 1002 (9th ed. 2009). Further, the Virginia Supreme Court has defined the word "license" as "conferring a right to do something which otherwise one would not have the right to do; it is a prerequisite to the right to carry on a business or do certain acts." *Commonwealth v. Shell Oil Co.*, 210 Va. 163, 166, 169 S.E.2d 434 (1969).

The above definitions suggest that the plain meaning of § 20-13 is to mandate a specific order between the two marriage requirements, first, the parties must obtain a license as permission to get married; and, second, the parties' union must be solemnized *under* that license. Because the purpose of a license is to authorize parties to engage in a specified act, such as marriage, and the marriage statute requires a license, it naturally follows that the license must come before the solemnization. Moreover, the use of the word "under" supports the interpretation that the statute intends a solemnization to occur after a license is obtained; the solemnization should occur "subject to the authority, control, direction, or guidance of" the license.

## B. *Other Relevant Statutes*

Va. Code § 20-14 provides that:

> Every license for a marriage shall be issued by the clerk or deputy clerk of a circuit court of any county or city. If from any cause neither the clerk nor his deputy is able to issue the license, it may be issued by the judge of the circuit court of such county, or city, who shall make return thereof to the clerk as soon as there may be one.

Va. Code § 20-14.
Va. Code § 20-14.1 provides that:

> Every marriage license issued under § 20-14 *shall constitute authority for a period of only sixty days from the date of issuance for the solemnization of a marriage of the licensees.* Whenever such sixty-day period shall have elapsed without the solemnization of a marriage of the licensees, the license shall expire.
>
> The provisions of this section shall not be construed to prevent licensees from applying for or receiving an additional license, either before or after expiration of any license, but no new license shall be issued except in compliance with all provisions of law applicable to the issuance of a license in the first instance.

Virginia Code § 20-14.1 (emphasis added). Thus, this statute requires that solemnization occur within sixty days of the issuance of a marriage license to the parties. If the parties do not marry within this prescribed time period, the license will expire and the parties must apply for a new license before solemnization can occur. It is important to note that § 20-14.1 does not provide a time limit that would apply to a situation in which the parties first had a solemnization and later obtained a license. The lack of any instruction as to a time period between solemnization and licensing, as opposed to the prescribed time period between licensing and solemnization, is an additional indication that the Virginia legislature envisioned the requirements of § 20-13 occurring in a specific order.

Va. Code § 20-16 provides that the parties must take an oath prior to issuance of a marriage license:

> The clerk issuing any marriage license shall before issuing the license require the parties *contemplating marriage* to state, under oath, or by affidavit or affidavits filed with him, made by the parties for whom the application is made, before a person qualified to take acknowledgments or administer oaths, the information required to complete the marriage record. Such clerk shall make two certificates thereof and deliver them, together with the license, to the person entitled thereto. . . .

Virginia Code § 20-16 (emphasis added). The words "contemplating marriage" used in this statute indicate that a license is obtained before the parties are actually married — before a solemnization *under* a license occurs. This notion is also reflected in the actual license that is issued to the parties by the clerk after the licensing requirements are fulfilled. The oath located above the signature lines on a marriage license states that "neither of the parties named above who *are to be married* is legally incompetent. . . ." Additionally, in box 23 on every marriage certificate issued by a clerk of the Commonwealth, the license states:

> 23 TO ANY PERSON LICENSED TO PERFORM MARRIAGES You are hereby authorized to join the above-named persons in marriage under procedures outlined in the statutes of the Commonwealth of Virginia.

*See, e.g.*, License, Def. ex. 4. The language in box 23 of the marriage certificate accords with the aforementioned definition of the word "license." It demonstrates that a marriage license issued by a clerk of the Commonwealth provides authorization for an officiant to "commit some act," solemnization, "that would otherwise be unlawful" without a license.

Most significantly, Va. Code § 20-28 prescribes criminal penalties for an officiant that celebrates a marriage without a license. § 20-28 reads as follows:

> If any person *knowingly perform the ceremony of marriage without lawful license,* or officiate in celebrating the rites of marriage without being authorized by law to do so, he shall be confined in jail not exceeding one year, and fined not exceeding $500.

Va. Code § 20-28 (emphasis added). The fact that criminal penalties attach to the act of performing a marriage where no license has been issued is, to say the least, a compelling indication that a license must precede the ceremony.

Finally, a statute located in Title 32.1, within the chapter for Vital Records, indicates that a marriage license should precede a solemnization. Va. Code § 32.1-267(C) states:

> Every person who officiates at a marriage ceremony shall certify to the facts of marriage and file the record in duplicate with the officer who issued the marriage license within *five days after the ceremony. . . .*

Va. Code. § 32.1-267(C) (emphasis added). The fact that this statute requires an officiant to certify the facts of marriage *after* a ceremony indicates that the Code requires a solemnization to occur after licensing. Additionally, this interpretation is supported by case law. *See Davidson v. Davidson,* No. 2356-08-3, 2009 Va. App. LEXIS 313, at *4 (July 14, 2009) ("The marriage license presupposes a 'marriage ceremony' solemnizing the union. Code § 32.1-267(C).").

### C. *Virginia Code § 20-31, the Curative Statute*

The Plaintiff argues that Va. Code § 20-31 can be employed by this Court to validate the parties' marriage in this case. Va. Code § 20-31 states that:

> No marriage solemnized *under a license* issued in this Commonwealth by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such person, *or any defect, omission, or imperfection in such license,* if the marriage be in all other respects lawful, and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage.

Va. Code § 20-31 (emphasis added). The Court finds that the above statute is not applicable to the instant case. Virginia Code § 20-31, like § 20-13, requires that the marriage be solemnized under a license. While the statute goes on to describe various ways in which a marriage that would otherwise be invalid could be saved, it also has requirements that must be fulfilled before the statute can apply. Here, the license was obtained after solemnization, not before. That renders the marriage void *ab initio*, and a marriage that is void *ab initio* cannot be saved by Va. Code § 20-31.

Moreover, even if § 20-31 did not specifically limit its application to marriage "solemnized under a license," the plain language of the statute establishes that it could not apply in the instant case. Section 20-31 provides just two types of flaws that can be cured by the statute: (1) a want of authority in the officiant performing the marriage; and (2) any *defect, omission, or imperfection* in the marriage license. Plaintiff asks that the Court find that the flaw in this case is a defect, omission, or imperfection in the marriage license. However, the flaw in this case was not a defect, omission, or imperfection in the marriage license; rather, it was the complete lack of any marriage license prior to solemnization.

## D. *Statutes on Void and Voidable Marriages*

The Virginia legislature has declared that certain marriages are void and others are voidable. A void marriage is a nullity. In contrast, a voidable marriage is valid until declared otherwise and must be annulled by court order.

Va. Code §§ 20-38.1, 20-45.1, and 20-45.2 describe prohibited, and hence void, marriages. Va. Code § 20-38.1 provides that: "(a) The following marriages are prohibited: (1) a marriage entered into prior to the dissolution of an earlier marriage of one of the parties; (2) a marriage between an ancestor and descendant, or between a brother and a sister, whether the relationship is by the half or the whole blood or by adoption; (3) a marriage between an uncle and a niece or between an aunt and a nephew, whether the relationship is by the half or the whole blood." Va. Code § 20-45.1 provides that: "(a) All marriages which are prohibited by § 20-38.1 or where either or both of the parties are, at the time of the solemnization of the marriage, under the age of eighteen, and have not complied with the provisions of § 20-48 or § 20-49, are void. (b) All marriages solemnized when either of the parties lacked capacity to consent to the marriage at the time the marriage was solemnized, because of mental incapacity or infirmity, shall be void from the time they shall be so declared by a decree of divorce or nullity." Va. Code § 20-45.2 provides that: "A marriage between persons of the same sex is prohibited. Any marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable."

Prohibited marriages include bigamous, incestuous, same-sex, and underage marriages. Va. Code § 20-89.1 describes how a party may institute a suit of annulment. Section (a) of § 20-89.1 states that:

> When a marriage is alleged to be void or voidable for any of the causes mentioned in §§ 20-13, 20-38.1, 20-45.1 or by virtue of fraud or duress, either party may institute a suit for annulling the same; and upon proof of the nullity of the marriage, it shall be decreed void by a decree of annulment.

Va. Code § 20-89.1(a).

> The statute lists various ways in which a marriage can be voidable:

> (b) In the case of natural or incurable impotency of body existing at the time of entering into the marriage contract, or when, prior to the marriage, either party, without the knowledge of the other, had been convicted of a felony, or when, at the time of the marriage, the wife, without the knowledge of the husband, was with child by some person other than the husband, or where the husband, without knowledge of the wife, had fathered a child born to a woman other than the wife within ten months after the date of the solemnization of the marriage, or where, prior to the marriage, either party had been, without the knowledge of the other, a prostitute, a decree of annulment may be entered upon proof, on complaint of the party aggrieved.

Virginia Code § 20-89.1(b). Section (a) also lists §§ 20-13, 20-38.1, 20-45.1 as grounds for annulment. Although the statute does not specify that marriages in violation of these statutes are void, the text of §§ 20-13, 20-38.1, 20-45.1 indicates that a marriage in violation of these statutes is invalid. Though void marriages are considered void *regardless of a court order*, the inclusion of these statutes in § 20-89.1 affords parties married in violation of §§ 20-13, 20-38.1, or 20-45.1 an avenue to seek a court's instruction as to the validity of their marriage, as occurred in this case. *See Davidson*, 2009 Va. App. LEXIS 313, at *2, n. 1 (noting that an annulment petition may be asserted to challenge a "void or voidable" marriage under § 20-89.1 where petitioner filed an annulment action seeking to declare her bigamous marriage void *ab initio*).

## IV. *Pertinent Case Law*

In addition to applicable statutes, Virginia case law is instructive as to the licensing requirement of § 20-13, the applicability of the curative statute, the distinction between a void and voidable marriage, and the application

of estoppel to a void or voidable marriage. This Section provides a general overview as to the purpose behind the marriage statutes, followed by an outline of the case law relevant to the license and solemnization requirements of § 20-13 and the curative statute, § 20-31. Finally, this Section discusses the difference between a void and voidable marriage and the implications of a void marriage.

## A. *The Purpose of Virginia Code § 20-13*

The Commonwealth of Virginia has a great interest in the institution of marriage, as stated by the Supreme Court of Virginia in *Herring v. Wickham*:

> The contract of marriage is the most important of all human transactions; it is the very basis of the whole fabric of civilized society. The status of marriage is *juris gentium*, and the foundation of it, like that of all other contracts, rests on the consent of the parties; but it differs from other contracts in this, that the rights, obligations or duties arising from it are not left entirely to be regulated by the agreement of the parties, but are to a certain extent matters of municipal regulation over which the parties have no control by any declaration of their will.

*Herring*, 70 Va. (29 Gratt.) 628, 635 (1878).

Thus, the Commonwealth deems it necessary to regulate marriage, and does so through the numerous statutes related to marriage, annulment, and divorce found in Title 20 of the Virginia Code. The most important of these statutes, for the Court's determination in this case, is Va. Code § 20-13. Section 20-13 prescribes specific steps that parties *must* follow in order to enter into a marriage that the Commonwealth recognizes as valid. *See Offield*, 100 Va. at 260 (finding that the statutory requirements for marriage are mandatory — not merely directory — and that any marriage not entered in accordance with these requirements shall be considered illegal and void). Additionally, § 20-13 is intended to prevent common law marriage, which is not and never has been recognized in the Commonwealth of Virginia. *See id.* at 260 (holding that common law marriage "it wholly at variance with the ideas of our people as to the requisites of a valid marriage. . . ."). Hence, the validity of a marriage under § 20-13 is "not left entirely to be regulated by the agreement of the parties;" but rather, must accord with the requirements enacted by the Legislature.

## B. *Does Va. Code § 20-13 Mandate That a License Precede Solemnization in Order To Constitute a Valid Marriage?*

Virginia appellate case law leads to the inescapable conclusion that licensing must occur prior to solemnization. Additionally, case law from

this Court holds that the curative statute, § 20-31, cannot be applied to remedy the lack of a marriage license. Furthermore, an advisory opinion issued by the Attorney General of Virginia indicates that a marriage license is required prior to solemnization and is a defect that cannot be cured by § 20-31.

In *Davidson v. Davidson*, the Virginia Court of Appeals held that a solemnization requires that the officiant and both parties be present. *Davidson*, 2009 Va. App. LEXIS 313, at * 5. In *Davidson*, the parties obtained a marriage certificate and had it signed by the officiant performing their August 31, 2006, marriage ceremony. 2009 Va. App. LEXIS 313, at *1. However, at the time of the ceremony, the appellee was still in the final stages of a divorce proceeding with a former spouse. Thus, on September 14, 2006, after the divorce proceeding had been completed, the appellant met alone with the officiant and asked him to "re-sign" a new marriage certificate and include a marriage date of September 14, 2006. 2009 Va. App. LEXIS 313, at *1-2. Although the appellee knew of the meeting, he did not attend. 2009 Va. App. LEXIS 313, at *2. Two years after the marriage ceremony, the appellant filed an annulment action to declare her marriage void *ab initio* on the grounds of bigamy. 2009 Va. App. LEXIS 313, at *2. The case was appealed to the Court of Appeals after the Circuit Court of Smith County denied the annulment petition.

The Court of Appeals noted that, although the parties' first marriage was void, they could have been married after the entry of the divorce decree. 2009 Va. App. LEXIS 313, at *4. However, the court found that the signing of the new certificate on September 14, 2006, was not sufficient to constitute a valid marriage. *Id.* In discussing the order of licensing and solemnization, the court stated that "[t]he marriage license presupposed a 'marriage ceremony' solemnizing the union. Code § 32.1-267(C)." 2009 Va. App. LEXIS 313, at *4-5. As to the requirement of solemnization, the court found that "whatever formalities the ceremony requires, at the very least, it requires the attendance of both the prospective bride and groom." 2009 Va. App. LEXIS 313, at *5. Finally, in a footnote to the opinion, the court noted that the curative statute, § 20-31, was not applicable in the case because the alleged marriage was void *ab initio*. 2009 Va. App. LEXIS 313, at *5, n. 3.

As to the requirements of solemnization, the Plaintiff urges the Court to consider the case of *Makheja v. Kundra*, 39 Va. Cir. 136 (Fairfax County 1996). In *Makheja*, the parties obtained a valid marriage license in Fairfax County, Virginia, and subsequently participated in a religious marriage ceremony in Washington, D.C., with an officiant licensed to solemnize marriages Virginia. *Id.* at 136. The next day, the parties went together to the officiant's house, where the officiant signed the license but no valid religious ceremony was conducted. *Id.* at 137. Despite the lack of another ceremony, the court "refuse[d] to look behind the marriage

license and examine the authenticity of any ceremony that was performed" and found the marriage to be valid. *Id.* (*citing Alexander v. Kuykendall,* 192 Va. 8, 11, 63 S.E.2d 746 (1951) (finding that civil law does not require any particular form of marriage ceremony)).

*Makheja* is distinguishable from the case at hand. First, the license in Makheja was obtained prior to the solemnization. Second, in *Makheja,* both parties were present when the officiant signed the license. Here, the license was obtained subsequent to solemnization and neither party was present when Rabbi Biber signed the license.

In the case of *In re Kulmiya,* the Court held that a marriage is invalid without a marriage license. 77 Va. Cir. 67, 68 (Fairfax County 2008). The parties in this case participated in a religious ceremony without obtaining a marriage license. *Id.* at 67. The court found that the curative statute only applies to marriages that are performed pursuant to a marriage license. *Id.* at 68. Thus, because no marriage license was issued, the court found that the parties' marriage was not valid when entered into. *Id.*

In *In re Ejigu,* the Court found that the curative statute did not apply to remedy the defect of a solemnization without a license. 79 Va. Cir. 349, 351 (Fairfax County 2009). In *Ejigu,* the parties engaged in a religious ceremony despite the lack of a marriage license. *Id.* at 349. The parties were never issued a marriage license, but held themselves out as husband and wife. *Id.* The court found that the curative statute, § 20-31, did not apply to the case because the defect was the "complete nonexistence of the license itself," not a defect in the officiant's authority or the contents of the license. *Id.* at 351. While this case differs from the case at hand because a license was never issued, the court in *Ejigu* discussed the matter of a retroactive license. *Id.* at 351, n. 3. Citing *Davidson* and *Kulmiya,* the court stated that a court cannot issue a marriage license retroactively to the date of a religious ceremony because it cannot create a fiction that the license existed when it did not. *Id.*

In addition to Virginia case law, the Attorney General of Virginia has issued an advisory opinion on the issue of licensing prior to solemnization. *See Opinion of Attorney General to The Honorable John T. Frey, Clerk, Circuit Court of Fairfax County,* 09-072, 2009 Va. AG LEXIS 50 (December 10, 2009). The Attorney General responded to a request by the Clerk of the Fairfax Circuit Court as to the following issues: (1) whether a court may affirm marriages for which the parties did not obtain marriage license; and (2) whether a court may order the clerk of the circuit court to issue a marriage license retrospectively under these circumstances. 2009 Va. AG LEXIS 50, at *1. Citing statutory authority under §§ 20-13, 20-28, and 20-31, the Attorney General answered the above questions in the negative. 2009 Va. AG LEXIS 50, at *1. Regarding the first question, the Attorney General opined that there was no authority for a court to exercise "equitable authority" to affirm a marriage performed when no license was

issued. 2009 Va. AG LEXIS 50, at *6. As to the second question, the Attorney General found that a court cannot order a clerk to issue a marriage license retrospectively. *Id.*

While the Court need not rely upon case law from foreign jurisdictions, it is worth noting that the United States District Court for the District of the Virgin Islands confronted a case quite similar to the matter before the Court. *See In re Khalil*, No. 2001/183, 2003 U.S. Dist. LEXIS 6229 (D. V.I. April 4, 2009). In that case, the parties were married in a religious ceremony without a license, but subsequently obtained a license fifteen months after the ceremony took place. 2003 U.S. Dist. LEXIS 6229, at *3. The applicable statute in the Virgin Islands addressed the requirement of solemnization, but, unlike the statute at issue in the Commonwealth of Virginia, did not explicitly state a licensing requirement. 2003 U.S. Dist. LEXIS 6229, at *7; see 16 V.I.C. § 32:

> No marriage shall be valid unless solemnized by
>
> (1) a clergyman or minister of any religion whether he resides in the Virgin Islands or elsewhere in the United States; or
>
> (2) witnessed by a Local Spiritual Assembly of the Bahai is [sic] according to the usage of their religious community; or
>
> (3) any judge or [sic] any court of record.

16 V.I.C. § 32.

However, the court cited a statute regarding an officiant's duty to ensure a license was obtained prior to performing a ceremony as authority for the requirement of a license prior to a ceremony. *Khalil,* 2003 U.S. Dist. LEXIS 6229, at *7-8; see 16 V.I.C. § 34:

> Whoever, being authorized by section 32 of this title to solemnize marriages, solemnizes a marriage without first having had delivered to him a license addressed to him, issued by the clerk of the territorial court and authorizing marriage, shall be fined not more than $500.

16 V.I.C. § 34. While the court took note of the common law view that marriages are deemed valid despite defective procedures, unless statutorily declared void, it declined to apply it to the statutory scheme at issue. *Khalil*, 2003 U.S. Dist. lexis 6229, at * 17. Thus, despite the lack of an express statutory declaration, the court held that a prior license is "a necessary predicate to a legal marriage under Virgin Islands law," and that a marriage in which a license was obtained after the ceremony is invalid. 2003 U.S. Dist. lexis 6229, at *17-18.

C. *Is a Marriage That Fails To Satisfy the Requirements of § 20-13 Considered a Void or Voidable Marriage?*

After determining the requirements of § 20-13, it is necessary to establish whether a marriage entered into in violation of these requirements is considered void or voidable. A void marriage "is a mere nullity and its validity may be impeached in any court, whether the question arise directly or indirectly, and whether the parties are living or dead." *Alexander v. Kuykendall*, 192 Va. 8, 13, 63 S.E.2d 746 (1951). A void marriage "confers no legal rights, and, when it is determined that the marriage is void, it is as if no marriage had ever been performed." *Id. (quoting Toler v. Oakwood Smokeless Coal Corp.*, 173 Va. 425, 432, 4 S.E.2d 364 (1939)). In contrast, a voidable marriage may be ratified by the parties; thus, it is considered valid, and treated as such, until a court declares it void. *Toler*, 173 Va. at 432.

Plaintiff cites *Marblex Design Int'l, Inc. v. Stevens* for the proposition that a marriage that fails to abide by the statutory requirements of § 20-13 is not void, but merely voidable, because it has not been expressly declared as the type of marriage (such as a bigamous marriage) that is void by statute. *See* 54 Va. App. 299, 678 S.E.2d 276 (2009). In *Marblex*, the Virginia Court of Appeals found that a "sham/green card marriage" was voidable, not void *ab initio*. *Id.* at 304. But *Marblex* is entirely distinguishable from the instant case. First, the court in *Marblex* found that "the crime is not the marriage itself, but conspiring to violate immigration laws." *Id.* at 303. In other words, in *Marblex*, the focus was not on whether the marriage was illegal or invalid but, rather, whether the parties entered into the marriage with criminal intent. Here, the principle issue is the validity of the marriage itself. Second, Plaintiff relies on *Marblex* for the proposition that, unless a Virginia statute expressly declares as void any marriage where solemnization preceded licensure, such a marriage would merely be voidable, not void. While this principle is undoubtedly true in some situations, such as a marriage based on fraud or the impotence of a party, it has no applicability in the instant case. Here, what makes the marriage void is the complete failure to obtain a license prior to solemnization.

This point is brought home by the *Marblex* court's reliance on *McConkey v. McConkey*, which concerned an annulment of a marriage based on fraud. 216 Va. 106, 215 S.E.2d 640 (1975). In *McConkey*, the Supreme Court wrote: "Clara's marriage to Sykes was not void *ab initio*. There is no evidence that the marriage ceremony was invalid. The annulment was based upon fraud on the part of Sykes, so that the marriage was voidable if Clara desired to have it annulled." *Id.* at 107. Unlike in *McConkey*, here there is clear and unequivocal evidence that the marriage ceremony was in fact invalid.

Additionally, as discussed above, the Supreme Court of Virginia found in *Offield* that marriages executed not in accordance with the

statute are "illegal and void." *See* 100 Va. at 260. Moreover, *Davidson, In re Kulmiya,* and *In re Ejigu,* all of which discuss the licensing requirement in § 20-13, found marriages that failed to abide by the § 20-13 requirements to be void. Therefore, the Court concludes that a marriage that does not fulfill the licensing and solemnization requirements is void *ab initio.*

### D. *Does Estoppel Apply to a Void Marriage?*

The case law makes clear that estoppel, as well as other equitable remedies, cannot apply to a marriage that was void *ab initio.* In *Heflinger v. Heflinger,* the Virginia Supreme Court found that a Plaintiff could not be barred by the equitable doctrine of clean hands from bringing a suit for annulment on the basis of a bigamous marriage. 136 Va. 289, 301, 118 S.E. 316 (1923). In rejecting the application of an equitable bar to the suit, the court stated that:

> The parties have *plainly and confessedly violated the provisions of the statute law* of the State, and, whatever may be the rule applicable to other contracts, *public policy forbids that a Plaintiff should be barred from bringing a suit to declare null a marriage contract which never had any valid existence.* The State is interested to preserve the integrity of the marriage tie, and to enforce its laws against prohibited marriages, and general rules applicable to private contracts should not be permitted to thwart the public policy of the State established for the protection of society. If the marriage in controversy was void from its inception, the public is interested that it should be so declared, and this public interest should not be defeated because the declaration of the fact is made at the instance of a guilty party.

*Id.* (emphasis added). Additionally, numerous courts have refused to employ equitable estoppel to award spousal support or engage in equitable distribution when the parties' marriage was void *ab initio. See Kleinfield v. Veruki,* 7 Va. App. 183, 190, 372 S.E.2d 407 (1988) (finding that "there [was] no authority for the parties by their actions outside of the law to invest the court[] with power to treat [their] relationship as a lawful marriage" where the plaintiff asked the court to make an equitable distribution award in a void marriage); *see also Shoustari v. Zamani,* 39 Va. App. 517, 520, 574 S.E.2d 314 (2002) (holding that equitable estoppel does not create an independent right to spousal support in a void marriage, and an argument for estoppel in this context has no basis in statute or case law).

The Plaintiff cites the cases of *Dry v. Rice* and *McNeir v. McNeir* as support for the proposition that the doctrines of equitable estoppel or laches

are applicable to a void marriage. *Dry*, 147 Va. 331, 340, 137 S.E. 473 (1927) (applying laches to bar a husband from contesting the validity of his wife's Nevada divorce from him); *McNeir*, 178 Va. 285, 16 S.E.2d 632 (1941) (applying clean hands, equitable estoppel, and laches to bar a wife from contesting the validity of her husband's divorce from their marriage). The Court finds both of these cases inapplicable to the current case because they concern the validity of divorce decrees, not the validity of a marriage that is void *ab initio* because it failed to abide by the statutory requirements for a valid marriage.

Plaintiff asserts that the Court ought to consider the motive of the Defendant in seeking to declare the marriage void. Plaintiff asserts that the Defendant's motive is to gain a strategic advantage in the litigation and that this matter was only raised after the Court made certain rulings adverse to the Defendant's position. The Defendant, in contrast, asserts that he brought this matter to the Court's attention because he had an ethical duty to do so once he recognized that his marriage was void. The Court need not reach this issue because a void marriage is void, regardless of the Defendant's motive in presenting the issue to the Court.

Additionally, Plaintiff also cites foreign case law in which courts applied the doctrine of equitable estoppel in cases where the parties failed to obtain marriage licenses prior to solemnization. *See Johnson v. Johnson*, 41 Tenn. 626 (1860); *Sook Hee Yun v. Young Jin Yun*, 908 S.W.2d 787 (Mo. App. 1995). In *Johnson*, the parties were married without a license, but obtained a license after the ceremony. 41 Tenn. at 629. Citing various authorities in support of the doctrine that marriage can be established by cohabitation and repute, the court found that the wife could be estopped from denying the validity of the marriage. *Id.* at 631-32. In *Yun*, the parties similarly were married without a license, but subsequently held themselves out as husband and wife. 908 S.W.2d at 788. The court found that the husband's actions in holding himself out as married, cohabiting with his wife, engaging in a marriage ceremony, and obtaining the benefits of a marriage estopped him from denying the existence of the marriage. *Id.* at 790.

*Johnson* and *Yun* are not persuasive because controlling case law in Virginia makes clear that the doctrine of equitable estoppel cannot be employed to prevent a Virginia circuit court from declaring a marriage void *ab initio*. Furthermore, the courts in these foreign jurisdictions permitted the use of equitable estoppel on the basis of the parties' cohabitation and decision to hold themselves out as being married. Virginia precedent, however, makes clear that a valid marriage cannot be presumed solely on the basis of the parties' cohabitation and reputation as a married couple. *See Hargrow v. Watson*, 200 Va. 30, 34, 104 S.E.2d 37 (1958) ("[C] ohabitation and repute do not constitute marriage . . . they only constitute evidence tending to raise a presumption of marriage which, like other

presumptions of fact, may be overcome by countervailing evidence.")
(*citing Reynolds v. Adams*, 125 Va. 295, 308, 99 S.E. 695 (1919)).

## V. *Analysis*

### A. *Licensing Must Occur Prior to Solemnization*

The statutory requirement that licensure precede the marriage ceremony is plain, explicit, and unambiguous. The numerous statutory mandates related to the requirements for obtaining a license, the oath required of the parties, the time period permitted between licensing and solemnization, the penalty for solemnization without a license, the reporting requirements after a solemnization under a license, and the language of the marriage license itself reiterate this principle. Licensure prior to solemnization ensures that, when two individuals participate in a marriage ceremony after obtaining a marriage license, they fully understand and fully appreciate that, upon completion of that ceremony, they will be legally married.

Contrast that with the statutory interpretation urged upon the Court by the Plaintiff, namely, that a ceremony of marriage and licensure can occur in any order. If that were the case, two individuals could undergo a ceremony of marriage without even having decided whether they would subsequently obtain a license and, thus, give the marriage legal status. Or two individuals could undergo a ceremony intending to follow up with a license but then change their mind in the days, weeks, or months after the ceremony. The two individuals could also learn something after the ceremony that disqualifies them from obtaining a license. What then would be the meaning of the ceremony? In sum, Plaintiff's position permitting licensure to be the critical final step in creating a legal marriage would have the effect of making the ceremony a fundamentally ambiguous event with uncertain implications. This is obviously not consistent with the preeminent significance accorded by our statutes to the marriage ceremony itself.

Nor can it be said that the parties entered into their marriage ceremony unaware that they were missing an essential item required by statute. The evidence is clear that Rabbi Biber advised both parties prior to the ceremony that they were supposed to have obtained a license prior to the ceremony and that licensure was necessary. Moreover, the fact that the Rabbi instructed the parties to obtain a license after the ceremony, or the fact that he executed that license a month later after receiving it by FedEx, does not convert a void marriage into a legal marriage. The statutes before the Court are mandatory, not discretionary. And while an officiant has broad authority to perform a ceremony in the manner he or she determines is most appropriate, the officiant has no authority to vary or waive statutory requirements.

## B. *Solemnization after Licensure Did Not Occur in This Case*

The Plaintiff argues that, if the law requires that a solemnization occur after the issuance of a marriage license, then that was in fact done in the instant case. The Plaintiff does not challenge the fact that the formal marriage ceremony took place on December 21, 2002, more than two weeks prior to the issuance of the license. Rather, Plaintiff makes two arguments in support of the proposition that a solemnization took place after the issuance of the license. First, the Plaintiff argues that the Federal Express delivery of the marriage license to Rabbi Biber constitutes the completion of the marriage ceremony that was begun on December 21, 2002. Second, the Plaintiff argues that the Federal Express delivery of a signed marriage license to Rabbi Biber, in accordance with the Rabbi's instructions to send him the marriage license after it was obtained, represents a manifestation of commitment by the parties to be married and, therefore, itself constitutes a solemnization of the marriage. The Court rejects both arguments.

First, while the laws of the Commonwealth do not prescribe a specific procedure for the solemnization of a marriage, they at least require the physical presence of the parties. *See Davidson*, 2009 Va. App. LEXIS 313, at *5 (finding that the presence of only one party at the signing of a license did not constitute a solemnization). Second, to say that transmittal of a marriage license to a marriage celebrant constitutes the solemnization of a marriage is to interpret the solemnization requirement out of existence. It is argued, however, that, where the parties have already undergone a formal marriage ceremony, the transmittal of a marriage license to a marriage celebrant takes on greater significance and should be viewed as a part of the ceremony itself. To accept this argument, however, is to accept the notion that a solemnization can be broken into multiple acts taking place over days, weeks, or months and, as long as one act, even an act that is itself innocuous or unilluminating, takes place after the marriage license is issued, then a legal marriage is brought into existence. Such a proposition of law is so clearly rife with problems as to make apparent that it cannot survive close scrutiny.

The fact that Virginia law does not dictate a specific formula for what constitutes an acceptable marriage ceremony cannot mean that the parties can dispense with the ceremony entirely. FedExing the license to Rabbi Biber, under even the most expansive definition of a "ceremony," does not qualify. Moreover, a solemnization — whatever else may characterize it — must be unambiguous. There must be no question as to what the parties intend to accomplish, and the act that a party contends is the solemnization must not depend for its efficacy on the testimony of the participants many years later. Finally, the Court rejects the notion that it invades the province of a minister to require that a post-licensure marriage ceremony at the very least must actually include a marriage ceremony.

In short, for solemnization to bring a marriage into legal existence, it must occur after the license was issued, it must occur in the presence of the parties, it must involve an actual ceremony of some sort, and that ceremony must not have occurred before the license was issued. FedExing the license fails each of these criteria.

### C. *The Curative Statute Does Not Apply to This Case*

The cases of *Davidson, In re Kulmiya*, and *In re Ejigu* illustrate that the curative statute is not applicable in a case where there is an absolute lack of a license prior to solemnization. The language of § 20-31 clearly indicates that the curative statute is only applicable when a marriage is solemnized *under* a license. As discussed above, this did not occur in this case. Moreover, the absence of a license issued prior to the ceremony was not a "defect, omission, or imperfection" in the license itself, for the obvious reason that a license cannot be defective, contain certain omissions, or be imperfect if it does not even exist.

### D. *The Failure To Obtain a License Prior to Solemnization Renders the Marriage Void*

As discussed above, a marriage that does not fulfill the requirements of § 20-13 is void. *See Offield*, 100 Va. at 260. The decisions in *Marblex, McConkey*, and *Offield*, as well as the location of § 20-13 in the annulment statute, § 20-89.1, demonstrate that a marriage not executed in accordance with § 20-13 is void *ab initio*. Unlike a voidable marriage, in which a proper licensure and ceremony occurred but something transpired prior to or during the marriage, such as fraud or impotence, that allows a party to annul the marriage, a void marriage is one in which the parties were never actually married. Satisfying the licensure and solemnization requirements is a prerequisite to obtaining a valid marriage. The parties' failure to do so in the instant case renders their marriage void *ab initio*. Because the parties never completed the requirements for a valid marriage, a valid marriage never came into existence.

### E. *Estoppel Does Not Apply to a Void Marriage*

The Plaintiff argues that, even if the marriage is void, the doctrine of equitable estoppel can apply to estop the Defendant from contesting the validity of the marriage. The Court rejects the notion that estoppel could apply to prevent a party from disputing the validity of a marriage that never existed in the first place. *Heflinger, Kleinfield*, and *Shoustari* dictate that estoppel cannot be used to prevent a party from asserting that a marriage is void. Additionally, the cases cited by the Plaintiff, *McNeir* and *Dry*, are not applicable to this case because they concern divorce decrees and not the validity of a marriage. Therefore, because the Court finds that the parties'

marriage was void *ab initio*, and not merely voidable, the Court also finds that the Defendant cannot be estopped from bringing this suit.

## Conclusion

Among the gravest decisions a circuit court judge could be called upon to make is the determination as to whether a marriage is legally void, especially where, as here, the parties intended to be married, believed they were married, and lived for years as a married couple. Nevertheless, no amount of intent or belief can confer legal status on a marriage which does not meet the core statutory requirements of licensure followed by solemnization. Because those core requirements were not met here, this Court finds the marriage to be void.